IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSSOCIATED WITH 603-703-6472 IMSI 311480047215700 and IMEI 358257935914311. STORED AT PREMISES CONTROLLED BY VERIZON | No. 1:24-mj- 185-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Bryan Silvestro, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 603-703-6472, ("Target Telephone 1", TT1), which is subscribed to Joseph COFFEY with service provided by Verizon Wireless (Verizon), which in turn has offices at 180 Washington Valley Road in Bedminster, New Jersey. TT1 is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

## AGENT BACKGROUND

3. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"). I have been a Special Agent since March 2006, and I have worked in law enforcement since August 2003. I am presently assigned to the DEA's Tactical Diversion Squad in Portsmouth, New Hampshire, where my primary responsibilities include investigating drug trafficking crimes. Over the course of my law enforcement career, I have had the opportunity to search, seize, and personally observe what I have recognized to be and what was later confirmed by laboratory analysis to be scheduled drugs, such as fentanyl, methamphetamine, and various narcotics lawfully available only by prescription. In addition to attending trainings, I have conducted or participated in surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of recorded communications related to drug trafficking. I also have executed or assisted in the execution of numerous search warrants in which drugs, drug proceeds, drug paraphernalia, and other contraband were found.

4. I am an investigative or law enforcement officer of the United States withing the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am also a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

5. Based on my training and experience, I have become familiar with the habits, methods, and procedures commonly employed by individuals engaged in drug trafficking.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846, 843, and 841 (Target Crimes) have been committed, are being committed, and will be by COFFEY, who is the primary user of TT1. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

8. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9. The DEA, with assistance from the Newmarket, NH Police Department, is conducting an ongoing covert criminal investigation of Joseph COFFEY and other known and unknown subjects regarding violations of Title 21, United States Code, Sections 841, 843, and 846 (drug trafficking, unlawful use of a communications facility, and conspiracy to commit drug trafficking) involving sales of methamphetamines.

10. On June 10, 2024, at 4:30 PM, SA Bryan Silvestro and TFO Lukacz met with a DEA Confidential Source (CS) at a neutral location. The CS has a prior criminal history to include a domestic related assault and was recently charged with New Hampshire state charges for witness tampering and drug possession. Since then, the CS

has agreed to cooperate with law enforcement in the hopes that such cooperation will be looked upon favorably by the court in his/her pending criminal case.  No express promises of any kind have been made to the CS in exchange for his/her cooperation. The CS stated he/she had previously purchased crystal methamphetamine from Joseph COFFEY who the CS knew resided in the area of ▓▓▓▓▓▓▓▓▓▓ Manchester, NH. Later in this investigation, agents identified that COFFEY lives in ▓▓▓▓▓▓▓▓▓▓▓▓, ▓▓▓▓ Manchester, NH.

11.     The CS stated that COFFEY does not have a driver's license, so all prior meth transactions involving the CS have occurred at COFFEY's residence. The largest quantity of drugs that the CS has observed inside of COFFEY's residence was approximately ¾ lbs –1lb of crystal methamphetamine in what appeared to be a clear zip lock bag. The CS does not know where COFFEY gets their product from and mentioned it would be out of the ordinary for him/her to ask COFFEY about that.

12.     On or about July 8, 2024, while under the direction of law enforcement, the CS sent a message to TT1 stating, "Well damn missed that by a minute. I finally go some breathing room. You around Wednesday about 6ish for me to grab one." This communication was in an effort to set up a 1-ounce purchase of methamphetamine from COFFEY on Wednesday July 10, 2024. COFFEY replied back with three text messages in a row stating, "Yeah no doubt." "Gochu quality is night and day from last time. Just wait til you try it."  The CS responded, "Dig it. Thanks Joe." COFFEY replies to this message, "Cool see you in a bit." To which the CS texts back, "No no sorry, Wednesday night im still working up north." COFFEY replies back with two messages in a row, "Oh ok." "I'll have it set aside." The CS replies, "Ty."  COFFEY replies back, "A full?" The CS answers,

"Yes please" COFFEY responds, "Copy I managed to keep the same price even with the quality hike." The CS texts back, "Nice and you're still in the same place I'd assume?" COFFEY responds to the CS, "Correct that is my home." The CS replies, "Okay bud see you Wednesday thanks." COFFEY replies back with a thumbs up emoji.

13. On or about July 10, 2024 and under the direction of law enforcement, the CS sent a message to TT1 confirming they were still going to meet at 6:00PM at COFFEY's apartment. The CS texted, "Hey Joe, I'm on my way down still good for 6-ish." COFFEY replies, "Yep." The CS texts back, "Cool I'll hit you up when I'm close." COFFEY responds to the CS, "Cool." The next CS message to COFFEY reads, "Hey Joe, I am just seconds away." COFFEY responds, "Ok." At approximately 6:18PM, the CS texts COFFEY and says, "Joe, I'm here if your buzzer works, but I'm getting out of my truck right now heading to the door." COFFEY replies in two messages, "OK." "Buzz works."

14. After the CS entered ▮▮▮▮▮▮▮▮▮▮ TFO Wilton, who had followed the CS into the building, observed the CS enter COFFEY's apartment, ▮▮▮, where electronic surveillance showed the CS conduct the controlled purchase from COFFEY. Following the transaction, the CS departed COFFEY's apartment and was surveilled to a predetermined meeting location where he/she turned over 1 oz. of a crystal rock substance to agents. The substance was consistent in appearance with methamphetamine.

15. On or about July 11, 2024 and under the direction of law enforcement, the CS sent TT1 another message. The message read, "Yo that's good stuff man! My mountain guy likes it too. How much heads up do you need for something heavy."

5

COFFEY replies, "Day or two." The CS ends the message with COFFEY by texting, "Right on, I guess you solved your supply issues lol."

16.     On or about July 12, 2024, and under the direction of law enforcement, the CS sent TT1 another text message. The message read, "Hey got a number for me." COFFEY replied back, "How does 18 sound." The CS responded, "For a 1/2lb? Ill get back asap."

17.     On or about July 16, 2024, the CS received an unsolicited text message from TT1 asking, "Hey man you still want that?" which the CS understood as referring to the 1/2 pound of methamphetamine they discussed on July 12, 2024. The CS responded, "Actually man, you read my mind. I was about to text you ask I'm wrapping up work if Thursday evening would work I am in. I think I should probably be down to Manchester by six-ish." When they discuss Thursday evening, they are talking about meeting on July 18, 2024. The CS and COFFEY then exchange numerous messages via TT1 negotiating the cost of a half-pound of methamphetamine. They finally come to an agreement of $1,800.

18.     On July 18, 2024, at approximately 6:20PM, members of the DEA Portsmouth Tactical Diversion Squad (PTDS) established surveillance in the area of ■ ███████████ Manchester, NH. Meanwhile, at approximately 6:20PM, TFO Lukacz and SA Silvestro met with the CS at a predetermined neutral location where the CS was provided with $1,800 in Official Advanced Funds (OAF) for the previously arranged purchase of 1/2 pound of crystal methamphetamine.  Shortly thereafter, SA Silvestro and TFO Lukacz followed the CS' vehicle to the parking lot of ███████████ At

approximately 6:32PM, surveillance units observed the CS walk into Building 2. At approximately 6:40PM, the CS exited the building, with a package in hand, and got back into her/his vehicle. The CS was followed back to the neutral meeting location by surveillance units. At approximately 6:45PM, TFO Lukacz and SA Silvestro met with the CS at the agreed location at which time the CS turned over a cardboard box that contained a clear plastic Ziplock bag holding a large amount of a clear colored, rock-like substance to TFO Lukacz. The substance is consistent in appearance with methamphetamine. A field test of the substance returned a presumptive positive result for methamphetamine.

19.    Based on the foregoing, I believe that TT1 is presently being used to conduct communications in furtherance of COFFEY'S distribution of controlled substances. Thus, there is probable cause to believe that tracking TT1 will assist in surveillance and lead to the identification of other locations and persons involved in drug trafficking.

## ADDITIONAL INFORMATION ABOUT WIRELESS CARRIERS

20.    In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location

information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

21. Based on my training and experience, I know that Verizon can collect cell-site data about TT1. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

22. Based on my training and experience, I know that Verizon also collects data about the speed with which signals travel between cellular telephones and cellular towers, which is known as per call measurement data or PCMD. For each cellular telephone accessing its network, providers, including Verizon, use PCMD and other data

to calculate and record the estimated location of that cellular telephone. Verizon refers to the resulting location information as round-trip timing or RTT and this information can provide more precise location information than typical cell-site data.

## AUTHORIZATION REQUEST

23. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of TT1 would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

24. I further request that the Court direct Verizon to disclose to the government any information described in Attachment B that is within the possession,

9

custody, or control of Verizon. I also request that the Court direct Verizon to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of TT1 on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

25. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate TT1 outside of daytime hours.

Respectfully submitted,

/s/ Bryan Silvestro
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to before me on ___July 29_____, 2024

_Andrea K. Johnstone_
ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number 603-703-6472, with unknown subscriber ("Target Telephone 1"), which has service provided by Verizon Wireless (Verizon), which has offices at 180 Washington Valley Road in Bedminster, New Jersey.

2. Records and information associated with Target Telephone 1 that are within the possession, custody, or control of Verizon.

**ATTACHMENT B**

**Particular Things to be Seized**

**I. Information to be Disclosed by the Provider**

All information about the location of Target Telephone 1 described in Attachment A for a period of <u>thirty days</u>, during all times of day and night.  "Information about the location of Target Cell Phone 1" includes all available E-911 Phase II data, GPS data, latitude-longitude data, per-call measurement data or PCMD, round-trip timing or "RTT" data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon, Verizon is required to disclose the Location Information to the government.  In addition, Verizon must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of Target Cell Phone 2 on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II. Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 846, 843, and 841 involving Joseph COFFEY.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.